# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Natural Titanium iPhone 15 Pro
Evidence Barcode E7180358

)
)
)
)
)
)

Case No.   '24  MJ1816

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-4, incorporated herein by reference.

located in the _____ Southern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❑ contraband, fruits of crime, or other items illegally possessed;

❑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 952, 960, and 963 | Importation of Federally Controlled Substances and Conspiracy Related Thereto |

The application is based on these facts:

See Affidavit of Special Agent Prescilla Gonzales which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Prescilla Gonzales*

*Applicant's signature*

Prescilla Gonzales, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ telephone _____ *(specify reliable electronic means)*.

Date:    05/10/2024

*Michelle M. Pettit*

*Judge's signature*

City and state:  San Diego, California

Hon. Michelle M. Pettit, U.S. Magistrate Judge

*Printed name and title*

## <u>AFFIDAVIT</u>

I, Special Agent Prescilla Gonzales, being duly sworn, hereby state as follows:

### INTRODUCTION

1.      I submit this affidavit in support of applications for warrants to search the following electronic device(s):

> Silver iPhone 13 Pro Max, IMEI: 352996438149992 (Evidence Barcode E7180357) (**Target Device 1**);
>
> White iPhone XR, IMEI: 357341094512149 (Evidence Barcode E7180358) (**Target Device 2**);
>
> Black iPhone (Evidence Barcode E7180356) (**Target Device 3**); and,
>
> Natural Titanium iPhone 15 Pro (Evidence Barcode E7180358) (**Target Device 4**) (collectively, the **Target Devices**)

as further described in Attachments A-1, A-2, A-3, and A-4, and to seize evidence of crimes, specifically importation of federally controlled substances and conspiracy related thereto, in violation of Title 21, United States Code, Sections 952, 960, and 963, as further described in Attachment B. The requested warrants relate to the investigation and prosecution of Department of Homeland Security (DHS), U.S. Customs and Border Protection Officers (CBPO) Jesse Clark GARCIA and Diego BONILLO, who were arrested within the past week. The **Target Devices** currently are in the custody of the Federal Bureau of Investigation (FBI) located at 11385 Sorrento Valley Parkway, San Diego, California 92121.

2.      The facts and conclusions set forth in this affidavit are based on my own personal knowledge; knowledge obtained from other individuals during my participation in this investigation; my review of documents and records related to this investigation; communications with others who have personal knowledge of the events, details, and circumstances described herein; and information gained through my training, experience, and communications with colleagues experienced in the area of controlled substance investigations. Because this affidavit is submitted for the limited purpose of establishing

1

probable cause in support of the applications for the search warrants, it does not set forth each and every fact that I or others have learned during the course of this investigation. Dates, times, and amounts are approximate.

## BACKGROUND

3.     I am a Special Agent with the DHS, Office of Inspector General (OIG), and have been employed since December 2020. During my time with DHS OIG, I have investigated crimes involving public corruption, bribery, fraud, narcotics trafficking, human trafficking, excessive use of force, and violations of civil liberties. Currently, I am assigned as a Task Force Officer (TFO) with the FBI's Border Corruption Task Force (BCTF). Prior to DHS OIG, I was a Special Agent with United States Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI). I am a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program (CITP) and the Immigration and Customs Enforcement Special Agent Training (ICESAT) course.

4.     As a federal law enforcement officer for approximately 18 years, I have received formal training, as well as extensive on-the-job training, relative to the investigation of federal crimes, including those involving corruption, human smuggling, kidnapping/extortion, firearms smuggling, and narcotics trafficking. Through the course of my narcotics investigations, I have used a variety of investigative techniques and resources, including physical and stationary surveillance, informants and cooperating sources, pen register and trap and trace devices, telephone toll analysis, Title III wire-intercepts, undercover operations, search warrants, and electronic examinations of evidence. Through these investigations, my training, experience, and my conversations with other law enforcement investigators, I have become familiar with the methods used by narcotics traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder proceeds related to the sales of narcotics. I am also familiar with the methods employed by large-scale narcotics organizations in attempts to thwart detection by law

enforcement, including but not limited to the use of cellular telephone technology, burner telephones, encrypted applications, counter surveillance techniques, false or fictitious identities and addresses, and coded communications. With respect to coded communications, I know that such individuals often use coded language to obscure conversations about their unlawful activity because they believe coded language makes it more difficult to identify their conduct. Through the totality of my training and experience, I have familiarized myself with the jargon, mannerisms, and methods employed by distributors of controlled substances.

5.     Through the course of my training, investigations, prior law enforcement experience, and conversations with other law enforcement personnel, I am aware that it is a common practice for individuals involved in the importation of federally controlled substances to work in concert with other individuals and to do so by utilizing cellular telephones and other portable communication devices to maintain communications with others in order to further their illicit criminal activities. Such individuals often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing federally controlled substances. The telephone enables such individuals to maintain contact with criminal associates and coordinate with them. As such, those devices can store information about key locations, including the location of stash houses and homes of associates. They also can store, among others, messages referring to the illicit arrangements and the payment of monies related to those arrangements, the names and contact information of associates, and photographs reflecting drug importation activity.

6.     Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location

data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation of federally controlled substances may yield evidence:

      a.     tending to indicate efforts to import federally controlled substances;

      b.     tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the importation of federally controlled substances;

      c.     tending to identify criminal associates or others involved in the importation of federally controlled substances;

      d.     tending to identify travel to or presence at locations involved in the importation of federally controlled substances, such as stash houses, meeting locations, or associates' residences;

      e.     tending to identify the user(s) of, or person(s) with control over or access to, the **Target Devices**; and/or,

      f.     tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

### A. Background

7.     On May 3, 2024, a grand jury returned an under-seal Indictment charging eleven counts of drug trafficking activity against CBPOs GARCIA, BONILLO, and a third individual who remains a fugitive. The charges include conspiracy to import controlled substances, in violation of Title 21, United States Code, Sections 952, 960, and 963; multiple counts of importation of controlled substances, in violation of Title 21, United States Code, Sections 952 and 960; aiding and abetting, in violation of Title 18, United States Code, Section 2; *Pinkerton* liability; and criminal forfeiture. GARCIA and BONILLO were arrested on May 2, 2024, and May 4, 2024, respectively.

8.     GARCIA's and BONILLO's arrests stemmed from a long-term investigation by FBI BCTF, with assistance from the Drug Enforcement Administration (DEA).

GARCIA and BONILLO worked with a Mexico-based poly-drug Drug Trafficking Organization (DTO) to ensure that the DTO's drug-laden vehicles were admitted into the United States without inspection at the Tecate, California and Otay Mesa, California Port of Entries (POEs), respectively.

9.     As CBPOs, GARCIA and BONILLO were randomly assigned to various locations throughout their respective POEs in one-hour shifts, which were posted daily. The randomness of the shifts, the limited duration of the assignments, and the timing of the scheduling were efforts by CBP to reduce the potential for corruption. Nevertheless, the investigation reflected that GARCIA and BONILLO relayed their duty assignments to DTO members, including the times when they were assigned to the primary vehicle lanes and the specific lanes under their control, so that load vehicles could enter into the United States with their assistance free from inspection.

**B.     Coordination by GARCIA with DTO Members in 2021**

10.     On April 18, 2021, at 11:51 a.m., Vanessa Valdovinos applied for entry from Mexico into the United States at the Tecate POE driving her 2016 Kia Soul. Two vehicle lanes were operational. The one manned by GARCIA had traffic while the other one did not. Nevertheless, Valdovinos remained lined-up for GARCIA's lane. The CBPO operating the empty lane indicated to the limit-line CBPO to send vehicles to his lane. That CBPO, in turn, indicated for Valdovinos to change lanes; however, she hesitated before finally relenting. Due to a computer-generated alert, she was referred to the secondary inspection area. On the way towards secondary, Valdovinos kept looking back towards the vehicle primary area, specifically looking at GARCIA.

11.     In secondary, packages thought to contain approximately 63.68 kilograms of cocaine and 11.70 kilograms of methamphetamine were found concealed inside the Soul's front passenger door and rear doors, front and rear passenger seatbacks, rear quarter panels, spare tire, rear bumper, and in a backpack located in the rear hatchback. The DEA lab has since tested an approximate 10-kilogram sample of the supposed cocaine and has

determined that it contained 8.98 kilograms of fentanyl. A sample of the methamphetamine also was tested. It is 98 percent pure such that of the 1.32 kilograms tested, it contained 1.29 kilograms of methamphetamine (actual). Additionally, approximately 2.8 kilograms of suspected cocaine were later found concealed inside the vehicle. The suspected cocaine is currently being tested. GARCIA has been charged by the grand jury on an aiding and abetting and/or *Pinkerton* theory with this importation.

12.     Crossing records for Valdovinos reflect that she crossed through lanes manned by GARCIA approximately four of the seven times she crossed through the Tecate POE prior to her April 18, 2021, arrest. Given the concerted effort by CBP to randomly assign officers in one-hour shifts, investigators believe this statistic reflects a coordinated effort to cross at times when GARCIA was on duty. Indeed, Valdovinos's remaining three crossings were through lanes operated by three *separate* CBPOs.[1] Telephone evidence also reflects that Valdovinos had advance knowledge of GARCIA's schedule. For example, on April 9, 2021, at 8:36 a.m., Valdovinos crossed from Mexico into the United States through GARCIA's lane. A video found on Valdovinos's telephone reflects that, beginning at approximately 7:51 a.m., she filmed a video while riding in a vehicle in Mexico as it passed the Tecate POE. Others also were in the vehicle. Towards the end of the video, the following dialogue was heard:

| | |
|---|---|
| Male: | I'm going to hurry up a little bit, because I'm going to wait here for him to come, the (Unintelligible) the door. (Unintelligible) walking here or (Unintelligible). |
| Female #2: | (Unintelligible) |

---

[1]     Based on training and experience, investigators believe that these dates were likely dates when Valdovinos was burning plates. Investigators are aware that burning plates – a process whereby an individual and/or vehicle creates a crossing history – is commonplace amongst narcotics traffickers because they believe it reduces suspicion at the POE and/or provides plausible deniability as to their knowledge of the narcotics if they are caught.

| Valdovinos: | Ah, I saw! Yes, there are four doors [lanes], but right now only two are open. |
| Male: | Only two are open. |
| Valdovinos: | Two are open. |
| Female #2: | Which one is it that you come in? |
| Valdovinos: | The first one. |

13.     As reflected in the video, the "first" lane they passed as they drove was later manned by GARCIA. Indeed, records obtained from the POE reflect that GARCIA was scheduled to work that lane from 8:30 a.m. to 9:30 a.m., *i.e.*, beginning 39 minutes *after* the video was taken. As stated above, Valdovinos later crossed through that lane, which was indeed manned by GARCIA, at 8:36 a.m.

**C.     Coordination by GARCIA with DTO Members in 2023**

14.     On August 22, 2023, Amanda Mancera applied for entry from Mexico into the United States at the Tecate POE as the driver of her Toyota Camry. GARCIA admitted her. Records received from the Tecate POE reflect that GARCIA had been assigned to the pedestrian entry lanes at the time he admitted Mancera but had switched with another CBPO to work the vehicle primary lane shortly before she entered.

15.     Mancera was later arrested at the Route 94 checkpoint, which is located approximately 15 miles from the Tecate POE. Packages were found concealed in the Camry's trunk under a blanket, all four doors, the rear quarter panels, and underneath the front-passenger carpets. The DEA lab has since confirmed that the packages contained a total of 3.99 kilograms of fentanyl and 216 kilograms of cocaine. Mancera has since pled guilty to two counts of possession with intent to distribute federally controlled substances. As part of her guilty plea, Mancera admitted that the Camry was loaded with the fentanyl and cocaine at the time she crossed the border at the Tecate POE. GARCIA has been charged by the grand jury on an aiding and abetting and/or *Pinkerton* theory with this importation.

16.    As with Valdvinos, Mancera's crossing pattern reflects that she coordinated her crossings in order to be admitted by GARCIA. Indeed, crossing records reflect that she crossed through vehicle lanes manned by GARCIA on approximately 12 of the 32 times she crossed through the Tecate POE.[2] Indeed, telephone evidence reflects that Mancera also had advance knowledge of GARCIA's schedule. For example, on May 9, 2023, Mancera crossed through GARCIA's lane (lane two) at the Tecate POE at approximately 10:51 a.m. Prior to crossing, at approximately 10:19 a.m., a co-conspirator sent the following audio WhatsApp message to Mancera: "Remember, from 10:30 to 11:30, door [lane] two." A few minutes later he added, "Just calculate that it's 10:30, come slowly and, because there's no line, no line, Amanda, nothing, it's clean all the way down." Records obtained from the POE reflect that GARCIA was assigned to work lane two of the vehicle primary lanes from 10:30 a.m. to 11:30 a.m., *i.e.*, beginning 11 minutes *after* the message was sent by the co-conspirator to Mancera telling her to cross lane two between 10:30 and 11:30.

**D.    Coordination by BONILLO and GARCIA with DTO Members in 2023 and 2024**

17.    On February 6, 2024, at 10:32 a.m., Arquimides Jesus De Los Santos Rabiela was admitted from Mexico into the United States by GARCIA as the driver of a silver Ford Escape. Then, at 12:54 p.m., *i.e.*, more than two hours after Rabiela, Nayeli Viridriana Servin Vega entered the United States from Mexico in a Honda Odyssey. She, too, was admitted by GARCIA.

18.    Records from the POE reflect that GARCIA was assigned to work the primary vehicle lanes from 10:00 a.m. to 11:00 a.m., when Rabiela crossed, and then again from 12:00 p.m. to 1:00 p.m., when Servin crossed. With respect to Servin, CBP records also reflect that she was admitted by GARCIA despite there being an automatic referral for "High Risk Narcotics/Currency Smuggling" on her Odyssey requiring that she be referred

---

[2]    Four of the remaining 20 crossings were admissions by one CBPO, three were admissions by another, four were admissions by two separate CBPOs (two each), and the remaining nine admissions were by nine *separate* CBPOs.

for a secondary inspection. GARCIA subsequently told POE staff that he had received the alert late, which resulted in him inadvertently admitting the Odyssey. However, an audit of GARCIA's computer revealed that the automatic referral was received approximately 55 seconds *before* he admitted the Odyssey.

19.     After Rabiela and Servin were admitted by GARCIA, undercover officers surveilled them. Both vehicles subsequently were stopped and federally controlled substances were located inside their vehicles. With respect to Rabiela, a total of approximately 144 packages were found concealed within the factory voids of the trunk area, center console, and in a non-factory floor compartment located under both front seats. The packages are believed to contain approximately 32.35 kilograms of fentanyl, 37.1 kilograms of methamphetamine, and 54.6 kilograms of cocaine, according to presumptive testing. The DEA lab results are pending. With respect to Servin, a total of approximately 130 packages of presumptive methamphetamine, weighing approximately 58.87 kilograms, were found concealed inside a non-factory compartment located in the Odyssey's floorboard. This DEA lab report also is pending. GARCIA has been charged by the grand jury on an aiding and abetting and/or *Pinkerton* theory with these importations.

20.     Crossing records of Rabiela and Servin reflect that they coordinated their crossings in order to be admitted by GARCIA and BONILLO. For example, beginning on December 30, 2023, Rabiela crossed through the Tecate POE vehicle lanes 23 times. Three were in the silver Ford Escape, *i.e.*, the load vehicle, and the remaining were in a grey Ford Escape that bore the same license plate. Investigators believe that two nearly identical vehicles were utilized – one to smuggle drugs and one to burn plates – in order to avoid the risk that the driver and/or vehicle would have alerts placed due to finding an empty drug compartment during random inspections while burning plates. Notably, two of the three crossings in the silver load vehicle were through GARCIA's lane.

21.     With respect to Servin, before crossing through the Tecate POE, she crossed 23 times through the Otay Mesa POE vehicle lanes. Four of those crossings were through

BONILLO's lane, which reflects a coordinated effort. Indeed, the remaining 19 crossings were through lanes operated by 19 *separate* CBPOs. Moreover, telephone evidence reflects that she was loaded and in contact with known co-conspirators on dates she crossed through BONILLO's lanes, and not at other times she crossed through the Otay Mesa POE. For example, on December 14, 2023, after Servin entered the United States from Mexico at the Otay Mesa POE through BONILLO's lane, telephone evidence reflects that she had the following WhatsApp exchange with a co-conspirator:

| | |
|---|---|
| Servin: | I'm about to get to San Clemente (audio message)[3] |
| Servin: | I just passed secondary checkpoint |
| Co-conspirator: | Were they there |
| Servin: | No, closed. Do you have an address yet? |

22. Investigators are aware that there is a checkpoint located near San Clemente, California. Investigators are further aware that the operational status of checkpoints is often of concern to drug traffickers because vehicles carrying drugs may be identified by law enforcement officers or K-9s working at the checkpoints. As such, investigators believe, based on training and experience, that Servin had imported federally controlled substances on this date. Notably, as occurred on her arrest date, Servin was admitted close in time to Rabiela, who crossed approximately 30 minutes after her. She also crossed close in time to an individual named Luis Francisco Gonzalez-Montenegro, who crossed 2 minutes before her (his February 2024 drug seizure is discussed below). As with Servin, Rabiela and Gonzalez were admitted by BONILLO on this same date.

**E.    Coordination by BONILLO with DTO Members in February 2024**

23. On February 15, 2024, a CBPO working pre-primary at the Otay Mesa POE inspected a Buick LaCrosse being driven by Gonzalez. During the pre-primary inspection, the CBPO observed packages in one of the quarter panels and called-out over the radio

---

[3]    The timing of the message vis-à-vis Servin's crossing is consistent with Servin having driven directly from the POE to San Clemente.

"SDNET," which is an enforcement group that surreptitiously follows loaded vehicles from the POE in order to gain intelligence about other criminal associates and stash locations. The CBPO also notified the primary officer – BONILLO – and requested that the LaCrosse be sent to the secondary inspection area. Gonzalez was only one car away from BONILLO's booth at the time the discovery was made.[4] Notably, crossing records reflect that GONZALEZ was admitted *four* other times by BONILLO at the Otay Mesa POE – a statistically improbable number of crossings unless coordinated.

24. In secondary, a Z-Portal scan showed anomalies within the doors and rear quarter panels of the LaCrosse. A K-9 also alerted to the LaCrosse's trunk. Gonzalez and the LaCrosse were subsequently admitted into the United States, after placement of a GPS tracker, so that SDNET could follow it to its destination. Despite not being told that anything was amiss before he was released from the secondary inspection area, Gonzalez engaged in highly surveillance-cautious maneuvers after leaving the POE, including driving aggressively and making sudden U-turns. Investigators are aware that such efforts are typically utilized by drug traffickers in an effort to ferret out whether they are being followed. Gonzalez eventually parked the LaCrosse in a public parking area and then fled out of the back of a store after convincing a store manager that he was in danger. The LaCrosse was left behind. Given Gonzalez's immediate apparent suspicion after leaving the POE, investigators believe that BONILLO likely tipped-off the DTO that SDNET would be following Gonzalez.

25. Indeed, actions by members of the DTO reflecting that they believed they were being surveilled continued. For example, as investigators watched, a different individual arrived after several hours to the LaCrosse. She then drove it to a few locations, including trying to stay the evening at a hotel, before parking the LaCrosse on the street overnight. She later returned the next day and drove it to a residence where it was taken

---

[4]   BONILLO has been charged by the grand jury on an aiding and abetting and/or *Pinkerton* theory with this importation.

into a garage. A search warrant was then obtained for the residence. During execution, three males, later identified as Michael Morales, Cesar Meza, and Armando Gallo ran from the garage towards the rear of the residence and were apprehended at an outside patio. Inside the residence, Jamie Rose Perez, who had driven the LaCrosse to the residence, and a woman named Sheila Torres also were apprehended. Notably, Meza has three vehicle crossings through lanes manned by GARCIA, and one crossing through a lane manned by BONILLO. Similarly, crossing records reflect that Torres also crossed through BONILLO's lane approximately 18 minutes after Gonzalez entered in the LaCrosse.

26.     A search of the LaCrosse resulted in the seizure of 41 packages of fentanyl powder weighing approximately 43.42 kilograms; 3 packages of fentanyl pills, weighing approximately 2.18 kilograms; and 1 package of heroin, weighing approximately 1.01 kilograms. The packages were found concealed inside, among others, the vehicle's quarter panels, left door panels, and right passenger door panel. An additional 24 packages of fentanyl powder and 11 packages of fentanyl pills also were found in two duffle bags inside the residence.

27.     Notably, after her arrest, Torres was given the chance to make a call and told investigators that she wanted to call her cousin, who she identified as "Melissa." When the call was placed to the Mexican number of her supposed cousin, a male answered. Torres asked for Melissa, but the male seemed confused. This prompted Torres to exclaim, "Diego!" and state that she was in jail. The male then hung up. BONILLO's first name is "Diego," although investigators continue to investigate whether this was BONILLO.

**F.    Seizing the Target Devices**

**i.      Target Device 1, Target Device 2, and Target Device 3**

28.     On May 2, 2024, HSI investigators located in Hermosillo, Mexico learned that GARCIA was driving his GMC Yukon registered to him from the state of Sinaloa towards

Hermosillo, Mexico.[5] Because the grand jury had not yet returned the Indictment, BCTF investigators applied for and obtained an arrest warrant issued in connection with a complaint. HSI investigators then coordinated with Mexican law enforcement (MLE) who setup a vehicle checkpoint near Hermosillo in order to apprehend him. At approximately 9:39 p.m., GARCIA entered the checkpoint and was placed under arrest pursuant to expulsion from Mexico based on his arrest warrant (GARCIA is not a Mexican citizen). At the time of his arrest, GARCIA was the sole occupant of the Yukon. MLE located three cellphones in his vehicle, *i.e.*, **Target Device 1**, **Target Device 2**, and **Target Device 3**, as well as a wallet, U.S. Passport, and a SENTRI card in his name. GARCIA's property was turned over to HSI investigators on scene.

29.     GARCIA then was immediately driven to the Nogales, Arizona POE where his deportation was effectuated. HSI investigators followed behind the transport vehicle. Once at the POE, GARCIA and his property were turned over to BCTF Arizona investigators. GARCIA was not asked to identify **Target Device 1**, **Target Device 2**, or **Target Device 3**; however, before he was admitted into the federal facility near Tucson, Arizona, he requested that investigators assist in the retrieval of his girlfriend's telephone number from **Target Device 3**.

30.     BCTF Arizona investigators transferred custody of **Target Device 1**, **Target Device 2**, and **Target Device 3** to BCTF San Diego investigators on May 9, 2024.

**ii.     Target Device 4**

31.     On May 4, 2024, BCTF investigators coordinated with an FBI agent located in Las Vegas, Nevada to assist in locating BONILLO and arresting him pursuant to the arrest warrant issued after the grand jury returned the Indictment. This is because BONILLO's telephone was pinging in the area of the Aria Hotel in Las Vegas. At approximately 2:00

---

[5]     GARCIA had been in Mexico since late 2023 after taking an extended leave of absence from work. Shortly before his arrest, his work status transitioned to absent without leave after he stopped communicating with his supervisors.

p.m., Las Vegas investigators began locating BONILLO's whereabouts utilizing the pings and tracked him to the Las Vegas Convention Center. There, investigators located a vehicle BONILLO was believed to be using (investigators were aware from the investigation that it belonged to his roommate) and surveilled it. At approximately 2:45 p.m., investigators observed BONILLO walk out of the Convention Center, go towards the vehicle, and enter it. He then was approached by investigators and arrested. At the time of his arrest, **Target Device 4** was located on the front passenger seat.

32.     BCTF San Diego investigators traveled to Las Vegas for the interview. Post-*Miranda*, BONILLO provided the access pin to **Target Device 4** but did not provide consent to search it. BONILLO did not admit criminal wrongdoing.

33.     Based upon my training and experience, consultation with other law enforcement officers experienced in narcotics and other trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Devices**. In light of the above facts and my training and experience, I also believe there is probable cause to believe that GARCIA was using **Target Device 1**, **Target Device 2**, and **Target Device 3**[6] and BONILLO was using **Target Device 4** to communicate with others to further the importation of illicit narcotics. Accordingly, I request permission to search **Target Devices 1**, **2**, and **3**, for data beginning on December 23, 2020 (a month prior to Valdovinos's first crossing in GARCIA's lane, which occurred on January 23, 2021), up to and including May 3, 2024 (the day after GARCIA's arrest).[7] Investigators also request permission to search

---

[6]     As stated above, based on training and experience, I am aware that narcotics traffickers often utilize multiple cellular telephones, including burner telephones, in order to compartmentalize their illicit dealings.

[7]     Investigators are aware from training and experience that planning and coordinating a drug-importation offense often takes days or weeks. Investigators also know that criminal associates are often unaware of an arrest and will continue to attempt to contact the arrestee after his/her arrest.

**Target Device 4** for data beginning on October 6, 2023 (a month prior to Servin's first crossing in BONILLO's lane, which occurred on November 5, 2023), up to and including May 5, 2024 (the day after BONILLO's arrest).

## METHODOLOGY

30.    It is not possible to determine merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

31.    Following the issuance of the warrant, I will collect the **Target Devices** and subject them to analysis. All analysis, including forensic, of the data contained within the

telephone and its memory card will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

32.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to the warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

33.     There have been no prior attempts to obtain this evidence other than as stated above, except that on or about September 28, 2023, investigators obtained an iCloud warrant associated with GARCIA's telephone number 619-997-7846, for data from approximately March 1, 2023, to September 28, 2023. Investigators are unaware at this time whether one of the devices seized from GARCIA's vehicle at the time of his arrest is associated with the same iCloud account. To the extent it is, investigators may obtain some duplicate data from a search of the telephone that utilizes that iCloud account.

**CONCLUSION**

34.     Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the **Target Devices** will yield evidence of GARCIA's, BONILLO's, and others' violations of Title 21, United States Code, Sections 952, 960, and 963. Accordingly, I request that the Court issue warrants authorizing law enforcement to search the items described in Attachments A-1, A-2, A-3, and A-4, and seize the items listed in Attachment B using the above-described methodology.

//

//

//

//

//

I swear the foregoing is true and correct to the best of my knowledge and belief.

*Prescilla Gonzales*

Special Agent Prescilla Gonzales
DHS Office of Inspector General

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 10th day of May, 2024

*Michelle M. Pettit*

Honorable Michelle M. Pettit
United States Magistrate Judge

17

## **ATTACHMENT A-4**
PROPERTY TO BE SEARCHED

The following property is to be searched:

> Natural Titanium iPhone 15 Pro
> Evidence Barcode E7180358
> (**Target Device 4**)

**Target Device 4** is currently in the possession of the Federal Bureau of Investigation (FBI) located at 11385 Sorrento Valley Parkway, San Diego, California 92121.

## **ATTACHMENT B**
ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephones described in Attachments A-1, A-2, A-3, and A-4 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephones for evidence described below. The seizure and search of the cellular/mobile telephones shall follow the search methodology described in the affidavit submitted in support of the warrants.

The evidence to be seized from the cellular/mobile telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of December 23, 2020, up to and including May 3, 2024, for the cellular/mobile telephones described in Attachments A-1, A-2, and A-3, and for the period of October 6, 2023, up to and including May 5, 2024, for the cellular/mobile telephone described in Attachment A-4:

a. tending to indicate efforts to import federally controlled substances;

b. tending to identify accounts, facilities, storage devices, and/or services – such as email addresses, IP addresses, and phone numbers – used to facilitate the importation of federally controlled substances;

c. tending to identify criminal associates or others involved in the importation of federally controlled substances;

d. tending to identify travel to or presence at locations involved in the importation of federally controlled substances, such as stash houses, meeting locations, or associates' residences;

e. tending to identify the user(s) of, or person(s) with control over or access to, the **Target Devices**; and/or,

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960, and 963.